## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| GULF CHEMICAL & METALLURGICAL | ) |
| CORPORATION, a Texas corporation, *et al.*,1 | ) Case Nos. 16-22192-JAD & 16-22195-JAD |
| | ) (Jointly Administered under |
| Debtors. | ) Case No. 16-22192-JAD) |
| | ) |
| GULF CHEMICAL & METALLURGICAL | ) |
| CORPORATION, a Texas corporation, *et al.*, | ) Docket No. ____ |
| | ) |
| Movants, | ) |
| | ) |
| v. | ) |
| | ) |
| COMILOG HOLDING, AIR LIQUIDE | ) |
| INDUSTRIAL US LP, U.S. BANK | ) |
| EQUIPMENT FINANCE, DE LAGE | ) |
| LANDEN FINANCIAL SERVICES, INC., | ) |
| TEXAS COMPTROLLER, TEXAS | ) |
| ATTORNEY GENERAL ENVIRONMENTAL | ) |
| PROTECTION DIVISION, NMHG | ) |
| FINANCIAL SERVICES, INC., and WELLS | ) |
| FARGO EQUIPMENT FINANCE, INC., | ) |
| BANK OF THE WEST, | ) |
| | ) |
| Respondents. | ) |
| | ) |

## MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTORS TO OBTAIN SECURED POST-PETITION FINANCING AND USE OF CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) MODIFYING THE AUTOMATIC STAY; (IV) SETTING FINAL HEARING; AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession, Gulf Chemical & Metallurgical

Corporation ("Gulf") and Bear Metallurgical Company ("Bear," and together with Gulf, the

"Debtors"), by and through their undersigned counsel, hereby move the Court (this "Motion")

---

1 The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Gulf Chemical & Metallurgical Corporation, a Texas corporation (3600) and Bear Metallurgical Company, a Delaware corporation (1238).

for the entry of interim and final orders, pursuant to sections 105, 361, 362, 363(c), 364(c), 364(d), 503, 506(c) and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"): (i) authorizing the Debtors to obtain debtor-in-possession financing from the DIP Lender (as defined below) pursuant to the terms and conditions of (a) the Interim Order and any Final Order (each as defined below) and (b) the DIP Loan Agreement (as defined below); (ii) authorizing and approving the Debtors' use of Cash Collateral (as defined below) of the Pre-Petition Lender (as defined below), solely to the extent that the Pre-Petition Lender has a valid and perfected security interest in Cash Collateral, in accordance with the provisions of the Interim Order and any Final Order; (iii) granting the Pre-Petition Lender adequate protection, including, without limitation, adequate protection against the diminution in the value or amount of the Pre-Petition Collateral (as defined below) through (a) Replacement Liens (as defined below) and (b) superpriority administrative expense claims, each subject to the Carve-Out (as defined below), and the liens, security interests, and superpriority treatment granted to the DIP Lender, as more particularly set forth herein; (iv) subject to the Interim Order and any Final Order, vacating and modifying the automatic stay to the extent necessary to implement the provisions of the DIP Loan Documents (as defined below) and the Interim Order; and (v) granting any further and related relief as the Court deems just and equitable.

In support of this Motion, the Debtors respectfully represent as follows:

### **Background**

1.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are continuing in possession of their property and are operating and managing their businesses, as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.  Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The venue of the Debtors' chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The factual background regarding the Debtors, including their business operations, their capital and debt structure, and the events leading to the filing of the chapter 11 cases, is set forth in detail in the Declaration of Eric Caridroit in Support of Chapter 11 Petitions and First Day Motions (the "Caridroit Declaration"), filed contemporaneously with this Motion and fully incorporated herein by reference.[2]

**The Debtors' Prepetition Capital Structure**

4.      Prior to the Petition Date, Comilog Holding, a French limited liability partnership ("Comilog," and in its capacity as the pre-petition secured lender, the "Pre-Petition Lender"), made certain loans (the "Pre-Petition Loans") to Gulf.  The Pre-Petition Loans were made pursuant to the Secured Promissory Note, dated May 24, 2016 (the "Pre-Petition Financing Agreement").  Gulf's obligations to Comilog under the Pre-Petition Financing Agreement are secured by first priority liens and security interests (collectively, the "Pre-Petition Liens") in substantially all of Gulf's personal property assets (including Cash Collateral (as defined below)), the proceeds thereof, and Gulf's equity interests in Bear (collectively, the "Pre-Petition Collateral") pursuant to that certain Security Agreement, dated May 24, 2016 and that certain Intellectual Property Security Agreement, dated May 24, 2016.[3]  As of the Petition Date, the balance owed to the Pre-Petition Lender on a secured basis is $3 million.

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Caridroit Declaration.

[3] The Pre-Petition Lender's security interests are perfected by, *inter alia*: (i) a UCC Financing Statement filed with the Texas Secretary of State on June 1, 2016, at No. 16-0017883812; (ii) an assignment filed in the United States

5.      Prior to entry into the Pre-Petition Financing Agreement, Comilog made unsecured loans to Gulf in an aggregate amount of approximately $132 million.  Comilog is Gulf's parent company and Bear's indirect parent company.

6.      Bear did not have any secured debt as of the Petition Date.

### Preliminary Statement

7.      By this Motion, the Debtors seek approval, on an interim and final basis, of that certain Senior Secured Debtor-in-Possession Loan Agreement, dated June 13, 2016, by and between the Debtors, as borrowers, and Comilog, as lender (in its capacity as post-petition lender, the "DIP Lender"), under which the DIP Lender has agreed to provide the Debtors with an up to $12 million senior secured loan (the "DIP Loan"), pursuant to a debtor in possession financing facility, a copy of which is attached hereto as Exhibit A (the "DIP Loan Agreement").  As stated in detail in the Caridroit Declaration, the Debtors' goal in their chapter 11 cases is to sell substantially all of their assets through a sale process pursuant to section 363 of the Bankruptcy Code.  The proposed financing offered by the DIP Lender will provide adequate financing and flexibility to allow the Debtors to continue operating during the sales process, which will maximize the value of their assets so that they may obtain the highest and best purchase price.

8.      Prior to the Petition Date, the Debtors reviewed their financing options.  The Debtors, upon the advice of their advisors, determined that locating a lender willing to make an unsecured loan that would be *pari passu* with the more than $132 million in Comilog unsecured debt was not realistic.  With respect to secured financing, Comilog expressed its willingness to

---

Patent and Trademark Office with respect to patents owned by Gulf on May 26, 2016 (Reel 038823/0899); (iii) an assignment filed in the United States Patent and Trademark Office with respect to trademarks owned by Gulf on May 26, 2016 (Reel 5801/0135); and (iv) possession of stock certificate No. 101 issued by Bear, which stock certificate is registered in the name of Gulf, together with a blank and undated stock power signed by Gulf.

provide the DIP Loan.  As described in more detail below, no other secured financing was available to the Debtors on terms as favorable as the DIP Loan.

9.      The DIP Loan Agreement and the DIP Loan Documents (as defined below) are the result of a robust negotiation process and thus constitute fair and market-based financing.  As described in more detail below, the rates, fees, and other expenses to be paid in connection with the DIP Loan Agreement are reasonable.

10.     Importantly, this is not a so-called "roll-up."  Rather, the Debtors will use new money from the DIP Lender to fund their operations during these chapter 11 cases and not use the DIP Loan proceeds to pay off any of the amounts owed by Gulf on account of the Pre-Petition Financing Agreement.[4]   The obligations owed by Gulf pursuant to the Pre-Petition Loans are substantially over-secured by the Pre-Petition Liens, and the Debtors propose that any official committee of unsecured creditors appointed in these chapter 11 cases (the "Creditors Committee") will have the ability to investigate and contest such facts as is customary in chapter 11.

11.     Upon entry of the Interim Order, the Debtors anticipate that Gulf will immediately begin making draws on the DIP Loan; however, they anticipate that Bear will only draw on the DIP Loan in the event it needs cash to operate above and beyond the cash generated from its operations during its chapter 11 case.  The DIP Lender's DIP Liens (as defined below) will only attach to a Debtor's assets to the extent such Debtor makes a draw on the DIP Loan during these chapter 11 cases.

12.     The DIP Loan Agreement is critical to the Debtors' ability to continue their operations while seeking a purchaser or purchasers for their assets.  The DIP Loan will provide

---

[4] The Debtors do propose to use a portion of the DIP Loan to make adequate protection payments to the Pre-Petition Lender.

ample liquidity to fund the Debtors' operations through a sale process and is reasonable both in

cost and in protections offered to the Debtors' constituents.  In sum, the DIP Loan Agreement is

a strong endorsement of the Debtors' efforts to maximize recoveries for all stakeholders and,

thus, this Court should approve it.

### Bankruptcy Rule 4001 Concise Statement

13.     The Debtors request entry of the proposed interim order (the "Interim Order") and

a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders").

14.     The DIP Lender has agreed to provide the Debtors with necessary postpetition

debtor-in-possession financing in the amount of up to $12 million, subject to the terms of (i) the

DIP Loan Agreement, (ii) the DIP Orders, and (iii) the budgets attached hereto collectively as

Exhibit B (the "Budget," and together with the DIP Loan Agreement and the DIP Orders, the

"DIP Loan Documents").

15.     By this Motion, the Debtors respectfully request the following relief:

(a)     that the Court conduct a preliminary hearing to consider this Motion (the
"Interim Financing Hearing") pursuant to Rule 4001 of the Federal Rules
of Bankruptcy Procedures (the "Bankruptcy Rules") and Rule 4001-2 of
the Local Rules of the U.S. Bankruptcy Court for the Western District of
Pennsylvania (the "Local Rules");

(b)     that, after the Interim Financing Hearing, the Court enter an interim order
substantially in the form of the Interim Order authorizing the Debtors,
pursuant to sections 363 and 364 of the Bankruptcy Code and Bankruptcy
Rule 4001(b), to borrow money under the terms of the DIP Loan
Documents to fund the expenses set forth in the Budget upon the terms
and conditions set forth in the attached Interim Order, pending a final
hearing on this Motion;

(c)     that the Court authorize the adequate protection proposed in the DIP Loan
Documents and summarized below, pursuant to sections 361, 363, and 364
of the Bankruptcy Code, and find that no other adequate protection is
necessary to authorize the Debtors' use of Cash Collateral (as defined
below) in accordance with the Budget; and

(d)     that the Court schedule a final hearing (the "Final Financing Hearing") to approve the relief requested herein on a final basis.

16.     Pending the Final Financing Hearing and entry of the Final Order, the Debtors will enter into, and implement on an interim basis, the DIP Loan Agreement in accordance with the Interim Order.  Pursuant to Bankruptcy Rule 4001, the following are the material provisions of the DIP Loan Agreement and/or the Interim Order.[5]

| | |
|---|---|
| **Borrowers**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Gulf Chemical & Metallurgical Corporation and Bear Metallurgical Company |
| **Guarantors**<br>*Bankruptcy Rule 4001(c)(1)(B)* | N/A |
| **DIP Lender**<br>*Bankruptcy Rule 4001(c)(1)(B)* | Comilog Holding |
| **DIP Loan**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The DIP Loan Agreement contemplates the DIP Lender making multiple advances to the Debtors from time to time during the term of the DIP Loan Agreement (each an "Advance"), up to an aggregate principal amount of $12,000,000, subject to the cash needs identified in the Budget.  The maximum Advance prior to entry of the Final Order shall be in an amount of $3,000,000.  **DIP Loan Agreement at § 2; Interim Order at ¶ 26.**<br><br>The Debtors may request Advances by delivering a borrowing request to the DIP Lender, which request shall state that the proposed Advance is consistent with the terms of the Budget and is to be used solely for Budget items, and to the best of the Debtors' knowledge no Termination Event has occurred except as specified in such certificate.  **DIP Loan Agreement at § 2.2; Interim Order at ¶ 59.** |

---

[5] The summaries and descriptions of the terms and conditions of the DIP Loan Agreement and the Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified in their entirety by the DIP Loan Agreement and the Interim Order.  In the event there is a conflict between this Motion and the DIP Loan Agreement or the Interim Order, the DIP Loan Agreement or the Interim Order, as applicable, shall control in all respects.

| | |
|---|---|
| **Term**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The earliest to occur of: (a) December 31, 2016, (b) the occurrence of any "Termination Event" set forth in any DIP Order, or (c) the entry of an order approving the sale of substantially all of the Debtors' assets. **Interim Order at ¶ 30.** |
| **Interest Rates**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Non-Default Interest Rate: eight and one-half percent (8.5%) per annum.<br>Default Interest Rate: ten and one-half percent (10.5%) per annum. **DIP Loan Agreement at § 5; Interim Order at ¶ 46.** |
| **Fees**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | Gulf shall pay a closing fee of $50,000 payable from the proceeds of the DIP Loan. **Interim Order at ¶ 59(f).** |
| **Budget**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | 13-week budgets for each of Gulf and Bear which shall reflect projected cash receipts, operating disbursements, payroll disbursements, non-operating disbursements, and cash balances, as may be amended, updated, or supplemented with the prior consent of the DIP Lender. **Interim Order at ¶¶ 21, 22.** |
| **Carve-Out**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)* | The Pre-Petition Lender and the DIP Lender have agreed to provide a carve-out for the benefit of Retained Professionals (as defined in the Interim Order) and the United States Trustee from their respective liens: (a) U.S. Trustee fees pursuant to 28 U.S.C. § 1930 and the Retained Professionals' allowed fees and expenses, up to the amounts set forth for the respective Retained Professionals in the Budget, that are incurred or accrued prior to a Termination Event, the Maturity Date, or the later of: (i) entry of a Sale Order authorizing the sale of substantially all of Gulf's assets; (ii) entry of a Sale Order authorizing the sale of substantially all of Bear's assets; or (iii) entry of a Sale Order authorizing the sale of substantially all of the Debtors' assets; and (b) U.S. Trustee fees pursuant to 28 U.S.C. § 1930 and the Retained Professionals' allowed fees and expenses, up to a maximum of $200,000, incurred subsequent to a Termination Event, the Maturity Date, or the later of: (i) entry of a Sale Order authorizing the sale of substantially all of Gulf's assets; (ii) entry of a Sale Order authorizing the sale of substantially all of Bear's assets; or (iii) entry of a Sale Order authorizing the sale of substantially all of the Debtors' assets (the "Carve-Out"). **Interim Order at ¶ 37.** |
| **Liens and Priorities**<br>*Bankruptcy Rule*<br>*4001(c)(1)(B)(i)* | The DIP Loan Agreement will be secured by senior liens and security interests (collectively, the "DIP Liens"), in substantially all of the Debtors' assets other than Gulf's real property, but including Bear's real property and each of the Debtors' personal, tangible, or intangible property, including avoidance actions under sections 544, |

| | |
|---|---|
| | 547, 548, and 550 of the Bankruptcy Code (collectively, the "DIP Collateral"); *provided*, *however*, that (i) the DIP Liens will only attach to the assets of a Debtor to the extent the DIP Lender makes an Advance to such Debtor and (ii) the DIP Liens shall only be secured by the Debtors' avoidance actions under sections 544, 547, 548, and 550 (the "Chapter 5 Avoidance Actions") upon entry of the Final Order. **Interim Order at ¶¶ 38, 39, 41.** |
| | Pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Lender will be granted a superpriority administrative claim (senior to any other superpriority administrative claims) in an amount equal to the Advances made under the DIP Loan (the "Post-Petition Advance Superpriority Administrative Claim"). The Post-Petition Superpriority Administrative Claim shall be subordinate to only the Carve Out. **Interim Order at ¶ 41.** |
| | Pursuant to Sections 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the DIP Lender will be granted a senior first priority security interests and liens (other than Pre-Existing Liens (as defined in the Interim Order)), including priority over any liens acquired or perfected under Section 546(b) of the Bankruptcy Code, (the "Post-Petition Senior Lien"), in and upon the DIP Collateral. The Post-Petition Senior Lien shall be subject only to Pre-Existing Liens that are valid and enforceable and the Carve-Out. **Interim Order at ¶ 38.** |
| | The DIP Liens shall be senior to and shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) subject to applicable law, any liens arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors other than as expressly permitted under the DIP Loan Agreement. The DIP Liens are subject only to the Carve-Out. **Interim Order at ¶ 42.** |
| **Adequate Protection for Prepetition Lenders** *Bankruptcy Rule 4001(c)(1)(B)(ii)* | As adequate protection for the Pre-Petition Lender, Gulf will use proceeds from the DIP Loan make monthly payments in the minimum amount of interest due on the Pre-Petition Secured Loans. The obligations owed by Gulf to the Pre-Petition Lender under the Pre-Petition Loan Agreement will not be "rolled-up" into the DIP Loan and will be junior to and paid after the DIP Loan. **Interim Order at ¶ 47.** |

| | |
|---|---|
| | As additional adequate protection, to the extent of any diminution in value of the Pre-Petition Collateral, the Pre-Petition Lender will be granted an additional or replacement lien(s) in and upon all personal property of any kind and nature of Gulf, to the same extent, validity, and priority that Pre-Petition Lender possessed in such property on Petition Date (the "Replacement Lien").  The Replacement Lien shall be subordinate only to the DIP Liens and the Carve-Out. **Interim Order at ¶ 48.**<br><br>As additional adequate protection, to the extent of any diminution in value of the Pre-Petition Collateral, the Pre-Petition Lender will be granted, in accordance with section 507(b) of the Bankruptcy Code, a superpriority administrative claim (the "Superpriority Administrative Claim").  The Superpriority Administrative Claim shall be subordinate to the Carve-Out and shall not attach to, encumber or otherwise be paid from the Chapter 5 Avoidance Actions until entry of a Final Order. **Interim Order at ¶ 49.** |
| **Determination of Validity, Enforceability, Priority, or Amount of Pre-Petition <u>Claims and Liens</u>** *Bankruptcy Rule 4001(c)(1)(iii)* | The proposed Interim Order contains a provision binding the estate and all parties in interest with respect to the validity, perfection, enforceability, and extent of the Pre-Petition Lender's prepetition liens and debts and the waiver of claims against the Pre-Petition Lender, but gives any party in interest (other than the Debtors) the shorter of: (i) 120 days from the entry of the Final Order and (ii) 90 days from the date a creditors' committee is formed and retains counsel, to investigate such matters. **Interim Order at ¶ 7.** |
| **Waiver or Modification of <u>Automatic Stay</u>** *Bankruptcy Rule 4001(c)(1)(iv)* | The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be vacated and modified to the extent necessary to permit the DIP Lender and the Pre-Petition Lender to exercise all rights and remedies under the DIP Loan Agreement upon the occurrence of a Termination Event (as defined below) and after the giving of three (3) business days written notice of the same to the Debtors, the Committee, the U.S. Trustee, and their counsel; *provided, however*, that an order granting relief from the automatic stay must first be obtained by the DIP Lender and/or the Pre-Petition Lender to foreclose on any DIP Collateral. **Interim Order at ¶ 43.** |
| **Waiver or Modification of Nonbankruptcy Law Relating to the Perfection <u>of a Lien</u>** *Bankruptcy Rule 4001(c)(1)(B)(vii)* | The proposed Interim Order provides that the liens provided to the DIP Lender and the Pre-Petition Lender shall be effective and perfected upon entry of the Interim Order without necessity of the execution, recordation, or filings of security agreements, control agreements, pledge agreements, financing statements or other similar documents. **Interim Order at ¶¶ 38, 48, 50.** |

10

| | |
|---|---|
| **Waivers of Rights Under Section 506(c) of the Bankruptcy Code**<br>*Bankruptcy Rule 4001(c)(1)(B)(x)* | Subject to entry of a Final Order, except to the extent of the Carve-Out, no expenses of administration of the Debtors' chapter 11 cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, or costs of preservation or disposition of property that is subject to the liens of the Pre-Petition Lender or the DIP Lender, shall be charged against or recovered from the DIP Collateral and/or Pre-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principal of law, without the prior written consent of the DIP Lender and/or the Pre-Petition Lender.  **Interim Order at ¶ 44** |
| **Liens on Avoidance Actions**<br>*Bankruptcy Rule 4001(c)(1)(xi)* | Neither the DIP Liens nor the liens granted to the Pre-Petition Lender shall attach the Chapter 5 Avoidance Actions until entry of the Final Order.  **Interim Order at ¶¶ 38, 48, 49.** |
| **Termination Events**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The proposed Interim Order sets forth the following termination events (each a "Termination Event"):<br><br>(a) either Debtor's chapter 11 case is either dismissed or converted to a case under chapter 7 of the Bankruptcy Code;<br><br>(b) a trustee or an examiner with expanded powers is appointed in the chapter 11 cases;<br><br>(c) the Interim Order or Final Order is reversed, vacated, stayed, amended, supplemented, or otherwise modified in a manner which shall materially and adversely affect the rights of the DIP Lender or the priority of any or all of the DIP Lender's claims, liens, or security interests and which is not acceptable to the DIP Lender, in its discretion;<br><br>(d) the Final Order is not entered on or before thirty (30) days after the Petition Date;<br><br>(e) material non-compliance by either or both of the Debtors with any of the terms, provisions or covenants of this Interim Order or any Final Order;<br><br>(f) either or both of the Debtors use Cash Collateral other than as set forth herein and the Budget; |

(g) either or both of the Debtors make cash disbursements on an aggregate basis set in excess of 15% of the amounts set forth in such Debtor's respective Budget measured on a cumulative basis for a 4 week period starting from the first week of the First Budget; *provided*, *however*, that there shall be no excess variance with respect to the professional fees and expenses set forth in the Budget;

(h) Either or both Debtors fail to furnish the Second Budget (as defined in the Interim Order) on a timely basis;

(i) (i) the Debtors do not receive a binding offer to purchase substantially all of their assets on or before August 31, 2016; (ii) the Bankruptcy Court does not enter an order approving the sale of substantially all of the Debtors' assets on or before September 15, 2016; or (iii) the Debtors do not close on the sale of substantially all of their assets on or before September 30, 2016;

(j) the Debtors fail to comply with or perform, in any material respect, the terms and provisions of the Interim Order, Final Order, or any DIP Loan Document, including, without limitation, using a DIP Loan or Cash Collateral other than in accordance with the provisions of the Interim Order and the Final Order;

(k) the Debtors fail to comply with or perform, in any material respect, the terms and provisions of the Interim Order, Final Order or the DIP Loan Agreement;

(l) any motion or other proceeding is filed to approve a sale or other disposition of substantially all of the Debtors' assets without the consent of the DIP Lender and/or Pre-Petition Lender;

(m) any superpriority administrative claim, lien, or security interest equal or superior in priority to the Pre-Petition Liens, the DIP Liens, and/or the post-petition liens granted to the Pre-Petition Lender is granted;

(n) the automatic stay of section 362 is lifted so as to allow a party other than the Pre-Petition Lender and/or the DIP Lender to proceed against any material asset of the Debtors;

(o) the Debtors file, or the Bankruptcy Court enters an order confirming, a chapter 11 plan, which plan is not in form and substance acceptable to the Pre-Petition Lender and/or the

| | |
|---|---|
| | DIP Lender; |
| | (p) a party other than the Pre-Petition Lender or the DIP Lender file a reconsideration or appeal to the Interim Order or any Final Order; |
| | (q) a challenge to Pre-Petition Lender's liens and claims is brought by an interested party; and/or |
| | (r) the occurrence of an Event of Default (as defined below). |
| | **Interim Order at ¶ 32.** |
| **Events of Default**<br>*Bankruptcy Rule 4001(c)(1)(B)* | The proposed Interim Order sets forth the following events of default (each an "Event of Default"):<br><br>(a) Either Debtor's chapter 11 case shall be dismissed or converted to a Chapter 7 case;<br><br>(b) Any chapter 11 plan is confirmed without Pre-Petition Lender's and/or DIP Lender's consent;<br><br>(c) Unless otherwise approved and authorized by this Court or agreed to by Pre-Petition Lender and/or DIP Lender, any other superpriority administrative claim or post-petition lien equal or superior in priority to those granted to Pre-Petition Lender and/or DIP Lender pursuant to the Interim Order or Final Order is entered;<br><br>(d) The Interim Order or Final Order shall be amended, reversed, stayed, vacated, or otherwise modified in a way which materially and adversely affects the rights of Pre-Petition Lender and/or DIP Lender and which is not acceptable to Pre-Petition Lender and/or DIP Lender;<br><br>(e) Any breach by either or both of the Debtors of the Interim Order, Final Order, or DIP Loan Agreement;<br><br>(f) The occurrence of an Event of Default under the DIP Loan Agreement after the date the Interim Order is entered<br><br>(g) Either or both of the Debtors fail to pay (i) any principal amount of the DIP Loan when due or (ii) interest or any other amount when due and such failure continues for five (5) days after written notice to the Debtors.<br><br>(h) Any representation or warranty made or deemed made by the Debtors in the Interim Order, the Final Order, and/or |

<table>
<tr><td></td><td>DIP Loan Agreement is incorrect in any material respect on the date as of which such representation or warranty was made or deemed made; and

(i) Either or both Debtors fail to observe or perform any covenant, condition or agreement contained in the Interim Order, Final Order, and/or DIP Loan Agreement

**Interim Order at ¶ 60.**</td></tr>
</table>

### Local Rule 4001-2 Disclosures

17.     The Debtors submit that the Interim Order and the DIP Loan Agreement complies

with Local Rule 4001-2(b)(1) as follows:

| | |
|---|---|
| **Cross-Collateralization**<br>*Local Rule 4001-2(b)(1)(A)* | None. |
| **Investigation Period**<br>*Local Rule 4001-2(b)(1)(B)* | The proposed Interim Order contains a provision binding the estate and all parties in interest with respect to the validity, perfection, enforceability, and extent of the Pre-Petition Lender's prepetition liens and debts and the waiver of claims against the Pre-Petition Lender, but gives any party in interest (other than the Debtors) the shorter of: (i) 120 days from the entry of the Final Order and (ii) 90 days from the date a creditors' committee is formed and retains counsel, to investigate such matters.  **Interim Order at ¶ 7.** |
| **Waiver/Release, Without Notice, of Estate Rights Under Applicable Law**<br>*Local Rule 4001-2(b)(1)(C)* | None. |
| **Immediate Grant to Prepetition Lender Liens on Debtor's Avoidance Actions**<br>*Local Rule 4001-2(b)(1)(D)* | None.   No lien on the Chapter 5 Avoidance Actions will be granted prior to entry of a Final Order.  **Interim Order at ¶¶ 38, 48, 49.** |
| **"Roll-Up"**<br>*Local Rule 4001-2(b)(1)(E)* | None, *provided*, *however*, the Interim Order provides that the Debtors may use the proceeds of the DIP Loan to make adequate protection payments to the Pre-Petition Lender.  **Interim Order at ¶ 35.** |

| **Disparate Treatment for Committee Professionals** *Local Rule 4001-2(b)(1)(F)* | None.   The Committee professionals' fees and expenses are included in the Carve-Out.  **Interim Order at ¶ 37.** |
| **Non-Consensual Priming** *Local Rule 4001-2(b)(1)(G)* | None.  The Pre-Petition Lender has consented to the priming of its Pre-Petition Liens. |

**Request for Authority to Use Cash Collateral and to
Incur Secured Postpetition Financing**

18.     The Debtors require money for the operation of their businesses and administration of their bankruptcy estates, including, but not limited to, the payment of critical pre- and postpetition wages, salaries, and other expenses, which are essential to the preservation of the estates.  The continued operation of the Debtors is in the best interests of creditors, the estates, and all interested parties, because it will preserve going concern values and provide the prospect of greater potential recoveries for creditors than would the immediate termination and liquidation of the Debtors' businesses.  Accordingly, as provided in the Interim Order and any Final Order, the Debtors request that: (a) the Pre-Petition Lender make available to Gulf all of its cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents, whether original collateral or proceeds, products, rents, or profits of other Pre-Petition Collateral or the proceeds thereof (the "Cash Collateral")[6] and (b) the DIP Lender provide post-petition financing to the Debtors pursuant to the terms and conditions of the DIP Loan Documents.

19.     The ability of the Debtors to continue their businesses and maximize value for all constituents depends upon the Debtors obtaining such financing from the DIP Lender.   The DIP Lender is willing to make Advances under the DIP Loan Agreement and provide such other financial accommodations on a secured basis, as more particularly described herein, solely in

---

[6] The Pre-Petition Lender does not have a lien on the assets of Bear, so consent to the use of Bear's cash is not necessary.

accordance with the proposed Interim Order and any Budget and pursuant to the terms and conditions of the DIP Loan Agreement.

## Basis for Relief

### The Origins of the Debtor's Need for Financing

20.     As discussed in more detail in the Caridroit Declaration, over the past few years the Debtors have faced a number of challenges.   The fundamental driver of the Debtors' profitability is metals pricing, particularly the price of molybdenum and vanadium. Unfortunately, these prices have been at historical lows for years.  This has led to Bear being less profitable than it could be under different market conditions and Gulf consistently losing money. In addition, Gulf has faced aggressive environmental enforcement actions arising out of actions taken under former management.   Those actions and the related enforcement have led to substantial penalties and extremely expensive capital investment, further increasing losses at Gulf.

21.     In late 2015 and early 2016, Rothschild Global Financial Advisory ("Rothschild") was retained to explore transactions for the sale of Gulf's and Bear's businesses.  Since that time, Rothschild and the Debtors have engaged in a thorough prepetition marketing process.  Informed by that process, the Debtors have determined that it is in the best interests of the Debtors and their estates and creditors to sell their assets through this chapter 11 process.

22.     The Debtors will not be able to continue operations and conduct the sale process without financing.  Stoneleigh Group Holdings, LLC ("Stoneleigh") has been engaged by the Debtors as their financial advisor.  At the Debtors' request, Stoneleigh assisted the Debtors' management with the development of a cash flow forecast to determine the financing that the Debtors would need to continue their operations during a chapter 11 sale process.  This cash flow forecast developed into the Budget.

**The Financing Process**

23.     After determining that they would need a loan of up to $12 million to conduct operations during chapter 11 and provide for an appropriate sale process, the Debtors reviewed their financing options.  It was obvious to the Debtors and their advisors that no one would provide them unsecured financing, as any such financing would be junior to the $3 million owed to the Pre-Petition Lender and *pari passu* with the approximately $132 million owed to Comilog on an unsecured basis.  Accordingly, the Debtors approached Comilog about providing the necessary financing, which Comilog agreed to provide under the above-described terms of the DIP Loan Agreement.  Thereafter, to conduct a "market check," the Debtors, through Stoneleigh and counsel, contacted a number of other lenders about the possibility of providing a loan on better terms.  Such financing would have had to be junior to the Pre-Petition Loans, because the Pre-Petition Lender would not consent to a third party priming loan.  It quickly became clear to the Debtors and their advisors that the DIP Lender would be the only entity willing to lend the Debtors sufficient funds to achieve their goals in these chapter 11 cases.  The DIP Lender's proposed credit facility presents the best and only offer the Debtors have received.  The Debtors believe that securing the DIP Loan Agreement will allow the Debtors to avoid a costly and distracting fight over potential priming and adequate protection; instead, management may focus on preparing the Debtors for a future sale.

24.     The terms of the DIP Loan Agreement, including its structure, collateral required to be pledged, principal amount, pricing, and fee structure, are more favorable to the Debtors than what could have been achieved with any other potential lenders.

**Applicable Authority**

25.     The continued viability of the Debtors' business and the success of their sale efforts hinges upon the Debtors' ability to immediately access financing.  Absent immediate

access to financing, Gulf simply cannot operate its business.  Likewise, the ability to access financing from the DIP Lender will provide Bear a necessary backstop in the event it runs out of cash during the pendency of its chapter 11 case.  At this time, the Debtors' liquidity needs can be satisfied only if the Debtors are authorized to borrow up to a total of $12 million under the proposed DIP Loan Agreement and use such proceeds to fund operations and as otherwise provided in the DIP Loan Agreement and proposed Interim Order.

26.      Approval of the DIP Loan Agreement will allow the Debtors to remain operational, including paying their current and ongoing operating expenses (e.g., postpetition wages, salaries, and utility, and vendor costs).  Finally, the terms of the DIP Loan Agreement are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with its fiduciary duties.

**The Terms of the DIP Loan Agreement Are Fair, Reasonable, and Appropriate**

27.      The terms and conditions of the DIP Loan Documents are fair, reasonable, and appropriate in the circumstances presented, and were negotiated by the parties in good faith and at arm's length.

28.      The DIP Lender has required that the Debtors grant the liens and superpriority claims contemplated by the Interim Order and the DIP Loan Agreement upon the terms and conditions set forth therein.  Those liens and superpriority claims will be subject to the Carve-Out, which includes professional fees that are accrued and unpaid through the time of any Termination Event, up to $200,000 in professional fees accruing after notice of an event of default, and amounts payable to the Clerk of the Court and the United States Trustee.  Such carve-outs generally "preserve the adversary system" by ensuring that committees and a debtor's estate are adequately assisted by counsel.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that courts generally "insist on a carve out" for professional fees,

and that "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  Additionally, the Carve-Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of United States Trustee fees, Court fees, and professional fees of the Debtors and any official committee appointed in these chapter 11 cases, notwithstanding the grant of superpriority and administrative liens and claims under the DIP Loan Agreement.  The DIP Loan Agreement provides the Debtors with the liquidity they need to operate their businesses during the chapter 11 cases, which will preserve the value of their assets while the Debtors conduct a sales process. After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Loan Agreement are reasonable and appropriate under the circumstances.

29.     Bankruptcy courts routinely defer to a debtor's business judgment in considering whether to approve the debtor's request to obtain postpetition financing.  See e.g., Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (quoting order approving post-petition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); In re Ames Dep't Stores, Inc., 115 B.R. at 40 (The court should defer to debtor's "reasonable business judgment . . . so long as the financing agreement does not . . . leverage the bankruptcy process" and its purpose is to benefit the estate rather than another party-in-interest.).

30.     The Debtors exercised their reasonable business judgment in determining that the DIP Loan Agreement is the best financing option available under the present circumstances, and the Debtors have satisfied the legal requirements to incur the obligations under the DIP Loan Agreement.  The Debtors believe that the DIP Loan Agreement contains terms that are fair, reasonable, and in the best interests of the Debtors and their estates.  Accordingly, the Debtors

respectfully submit that they should be authorized to enter into the DIP Loan Agreement and obtain access to the DIP Loan Agreement on the terms described herein.

**The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis**

31.    Section 364 of the Bankruptcy Code allows a debtor to obtain (a) unsecured credit in the ordinary course of business, (b) unsecured credit outside the ordinary course of business, (c) credit with specialized priority or with certain security interests, and (d) secured credit by granting a senior or *pari passu* lien on already encumbered property.  In other words, section 364 is "structured with an escalating series of inducements . . ." that may be offered to attract postpetition financing.  Sapir v. CPQ Colorchrome Corp. (In re Photo Promotion Assocs., Inc.), 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), aff'd, 881 F.2d 6 (2d Cir. 1989).  Accordingly, if a debtor cannot obtain postpetition financing on an unsecured basis under sections 364(a) and (b), the bankruptcy court may authorize a debtor to obtain postpetition financing on a superpriority administrative expense basis pursuant to section 364(c), secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.

32.    Courts consider various factors in determining whether a debtor may obtain postpetition financing under section 364(c) of the Bankruptcy Code, including whether (i) the debtor is unable to obtain secured credit under section 364(b), (ii) the credit transaction is necessary to preserve the assets of the estate, (iii) the terms of the transaction are fair, reasonable, and adequate given the circumstances of the debtor-borrower and the proposed lender, (iv) entry into the financing constitutes an exercise of the debtor's sound and reasonable business judgment, and (v) the financing was negotiated in good faith and at arm's length between the debtor and the lender.  In re Farmland Indus., Inc., 294 B.R. 855, 879-81 (Bankr. W.D. Mo.

2003); see also In re Aqua Assocs., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (applying factors 1-3).

33.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Id.  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

34.     Due to the existing prepetition liens and security interests on the Debtors' assets as well as Comilog's large unsecured claim, the Debtors are unable to procure sufficient debtor in possession financing in the form of either unsecured credit under Bankruptcy Code sections 364(a) or (b), solely in exchange for the grant of an administrative expense or superpriority administrative expense claim or on a junior lien basis under section 364(c) of the Bankruptcy Code.  Neither the DIP Lender nor other potential lenders were willing to commit to postpetition financing on these terms.  In fact, almost any proposal other than the one submitted by the DIP Lender would have likely involved added costs and risks associated with nonconsensual priming

litigation.  As Judge Peck of the Southern District of New York has correctly pointed out, "[t]hat which helps to foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict."  In re Ion Media Networks, Inc., Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

35.     Based on the foregoing, the Debtors believe that they would not have been able to obtain debtor in possession financing on more favorable terms from other sources.  See, e.g., Bray, 789 F.2d at 1088 (section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

**The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by Priming Liens**

36.     If the incentives available under section 364(c) are insufficient to attract post-petition financing, a bankruptcy court may authorize post-petition credit under section 364(d) secured by a senior or *pari passu* lien on encumbered property (i.e., a "priming" lien) without consent from the affected lienholders if (i) the debtor cannot otherwise obtain credit and (ii) the interests of the existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (listing the above factors and also requiring that the "credit transaction" be "necessary to preserve assets of the estate").

37.     The Debtors approached several institutions to serve as potential financing sources and ultimately determined that the DIP Lender offered the only available option for obtaining postpetition financing.  In effect, the DIP Lender will be priming itself.  Further, the only liens to be primed under the DIP Loan Agreement are those liens that are otherwise subject to challenge by any creditors committee appointed in these chapter 11 cases.  The Debtors, therefore, do not believe that any existing creditors are harmed by such priming.

**Bear Should Be Authorized to Use Cash Collateral**

38.    Bear requires use of the Cash Collateral in order to permit the orderly continuation of its business, to maintain business relationships with vendors and suppliers, to make payroll, to make capital expenditures, and to satisfy other working capital and operational needs.

39.    Bankruptcy Code section 363(c)(2) provides that a debtor may not use, sell, or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Cash Collateral is included in the Pre-Petition Collateral.  Here, the Pre-Petition Lender has consented to Bear's use of Cash Collateral on the terms and conditions set forth in the Interim Order and in the DIP Loan Agreement.

40.    Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize Bear to use the Cash Collateral in accordance with the terms set forth in the Interim Order.

**Gulf Should Be Authorized to Provide Adequate Protection to the Pre-Petition Lender**

41.    To the extent that the Pre-Petition Lender suffers any harm as a result of the DIP Lender's priming liens, or otherwise through diminution in the value of the Pre-Petition Collateral it should be adequately protected.  A debtor may obtain postpetition credit that is "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  See 11 U.S.C. § 364(d)(1)(B).  Adequate protection is evaluated on a case-by-case basis and may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  See In re Mosello, 195

B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case . . . .") (citation and quotation omitted).  As described below, the DIP Loan Agreement provides a multi-faceted package of adequate protection to ensure that the Pre-Petition Lender being primed by the DIP Loan Agreement will be compensated to the extent of any diminution in the value of its Pre-Petition Collateral.

42.    As adequate protection, to the extent of diminution in the value of the Pre-Petition Collateral, the Debtors propose that, the Pre-Petition Lender receive:

(i)    <u>Replacement Lien</u>. The Replacement Lien in and upon all personal property of any kind and nature of Gulf, to the same extent, validity, and priority that Pre-Petition Lender possessed in such property on Petition Date.  The Replacement Lien shall be subordinate only to the DIP Liens and the Carve-Out.

(ii)    <u>Superpriority Administrative Claim</u>. Subject to the Carve-Out, a superpriority claim under section 507(b) of the Bankruptcy Code that is immediately junior to the superpriority claims granted to the DIP Lender.

(iii)    <u>Interest, Fees, and Expenses</u>.  The Pre-Petition Lender shall be granted, in accordance with section 507(b) of the Bankruptcy Code, a superpriority administrative claim (the "Superpriority Administrative Claim").  The Superpriority Administrative Claim shall be subordinate to the Carve-Out and shall not attach to, encumber or otherwise be paid from the Chapter 5 Avoidance Actions until entry of a Final Order.

**<u>Support for Modification of Automatic Stay</u>**

43.    As set forth more fully in the proposed Interim Order, the DIP Loan Agreement contemplates a modification of the automatic stay established pursuant to section 362 of the Bankruptcy Code to permit the DIP Lender, in its sole discretion, to take certain actions permitted or required under the DIP Loan Documents and to enforce certain remedies against the DIP Collateral without having to obtain any further order of this Court.  The Interim Order further provides that, prior to the exercise of certain enforcement or liquidation remedies against the DIP Collateral, the DIP Lender shall be required to give five business days' written notice to

each of counsel for the Debtor, any official committee of unsecured creditors appointed in these chapter 11 cases, and the United States Trustee.

44.     The Debtors submit that stay modification provisions such as these are ordinary and usual features of postpetition financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  See, e.g., In re QSL of Medina, et al., Case No. 15-52722 (Bankr. N.D. Ohio Dec. 15, 2015), In re A123 Sys., Inc., 12-12859 (KJC) (Bankr. D. Del. Nov. 26, 2012); In re Graceway Pharm., LLC, Case No. 11-13036 (MFW) (Bankr. D. Del. Nov. 7, 2011); In re Sportsman's Warehouse, Inc., Case No. 09-10990 (CSS) (Bankr. D. Del. Apr. 16, 2009).[7]  Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and the DIP Loan Documents.

**The DIP Lender Is Entitled to the Protections Under Section 364(e) of the Bankruptcy Code**

45.     Bankruptcy Code section 364(e), which protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal, was designed to "encourage lenders to extend credit to debtors by eliminating the risk that any lien securing the loan will be modified on appeal."  Keltic Fin. Partners, LP v. Foreside Mgmt. Co. (In re Foreside Mgmt. Co.), 402 B.R. 446, 451 (B.A.P. 1st Cir. 2009) (citing Shapiro v. Saybrook Mfg. Co. (In re Saybrook Mfg. Co.), 963 F.2d 1490, 1493 (11th Cir. 1992)); see also White Rose Food v. General Trading (In re Clinton St. Food Corp.), 170 B.R. 216, 220 (S.D.N.Y. 1994) (noting that section 364(e)'s purpose "is to overcome[s] parties' reluctance to lend to a bankrupt firm . . ."); Fleet Nat'l Bank v. Doorcrafters (In re N. Atl. Millwork Corp.),

---

[7] Copies of these orders are available upon request to the Debtors' proposed counsel.

155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of Section 364(e) is to allow good faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankruptcy entities.").

46.     The Debtors believe that the terms and conditions of the DIP Loan Agreement are fair and reasonable and are the best possible terms on which the Debtors could obtain postpetition financing.  Further, the terms and conditions of the DIP Loan Documents were negotiated in good faith and at arm's length with all parties represented by experienced counsel. Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Loan Agreement are later modified, vacated, stayed, or terminated by subsequent order of this or any other Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

**The Payment of Fees to the DIP Lender Is Appropriate**

47.     The Debtors have agreed, subject to Court approval, to pay a $50,000 closing fee for the DIP Loan, plus reasonable costs and expenses to the DIP Lender, including without limitation, reasonable fees and expenses of the professionals retained by the DIP Lender, as provided for in the DIP Loan Agreement, without the necessity of filing retention applications or fee applications.

48.     The fees and other obligations under the DIP Loan Agreement were negotiated in good faith and at arms' length and represent the most favorable terms to the Debtors on which the DIP Lender would agree to make the DIP Loan Agreement available.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Loan Agreement constitutes the best terms on which the Debtors could obtain the postpetition financing necessary to continue their operations.  The Debtors determined that

paying these fees in order to obtain the DIP Loan is in the best interests of the Debtors' estates, creditors, and all other parties in interest.

49.     Further, the fees are reasonable and appropriate under the circumstances. Courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in section 364 of the Bankruptcy Code.  See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving extension of financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

**The DIP Liens Should Be Deemed Effective**

50.     In order to effectuate the DIP Loan Agreement, the DIP Liens (as defined in the Interim Order) should be (a) deemed effective and perfected in all respects as of the Petition Date and without the necessity of the Debtors or the DIP Lender preparing, executing, entering into, recording, or filing any financing statements, mortgages, notices of lien, control agreements, pledge agreements, or similar instruments in any jurisdiction, and without the necessity of the DIP Lender taking possession or control of any DIP Collateral or DIP Lender taking any other action to attach or perfect the DIP Liens conceived of in the DIP Loan Agreement, and (b) shall extend and attach to all DIP Collateral and any proceeds of DIP Collateral which is presently in existence or hereafter is acquired or arises (whether acquired or arising before, on or after the Petition Date) and in which the Debtors have any legal or equitable interest, whether held by the Debtors or by any other person for the Debtors' account, and wherever located.  Notwithstanding the foregoing, the DIP Lender should be allowed (but not obligated), in its sole discretion, to file such financing statements, mortgages, notices of liens, and other similar documents without seeking modification of the automatic stay under section 363 of the Bankruptcy Code and all such financing statements, mortgages, notices of liens, and other similar documents shall be

deemed to have been filed or recorded at the time and on the date of the commencement of these

chapter 11 cases.

**Interim Approval Should be Granted**

> 51.    Bankruptcy Rule 4001(c) provides that:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c)(2).  Similarly, the Local Rules provide that:

> [t]he Court may grant interim relief pending review by interested parties of the proposed debtor in possession financing arrangements.  Such interim relief shall include only what is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Local Rule 4001-2(c).  Further, to the extent the Debtors are seeking authority to sell, use, or

otherwise incur an obligation regarding property of its estate, Bankruptcy Rule 6003 provides

that the Court may only grant immediate relief to the extent it is necessary to avoid immediate

and irreparable harm.  Fed. R. Bankr. P. 6003(b).

> 52.    Generally, courts find "immediate and irreparable harm" exists where loss of the

business threatens ability to reorganize.  See In re Ames Dep't Stores, Inc., 115 B.R. at 36 n.2.

Approval of the DIP Loan Agreement on an interim basis under Rule 4001(c)(2) is left to the

discretion of the court as informed by the facts of each case.  In examining requests for interim

relief under this rule, courts apply the same business judgment standard applicable to other

business decisions, and a debtor should be entitled to borrow those amounts that it believes

prudent in the operation of its business.  See In re Trans World Airlines, Inc., 163 B.R. at 974; In

re Ames Dep't Stores, Inc., 115 B.R. at 40.  After the 14-day period, the request for financing is

not limited to those amounts necessary to prevent the destruction of the debtor's business, and the debtor is entitled to borrow those amounts that it believes are prudent to the operation of its business.  In re Ames Dep't Stores, Inc., 115 B.R. at 36.

53.     The Debtors seek expedited approval of the relief requested in the Motion in light of the immediate and irreparable harm that the Debtors' estates will incur unless they obtain the financing necessary to sustain their businesses.  Absent sufficient funds to support the Debtors' operating business the Debtors' businesses and assets will quickly erode to the detriment of the Debtors' estates, creditors, and other parties in interest.  For the reasons set forth above, the Debtors submit that immediate access to $3,000,000 under the DIP Loan Agreement is necessary to preserve the value of the Debtors' estates for the benefit of their creditors and other parties in interest.

## Waiver of any Applicable Stay

54.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in the Motion is necessary for the Debtors to operate without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

## Request for Final Financing Hearing

55.     Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on this Motion may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, a bankruptcy court is empowered to conduct a preliminary expedited hearing

on such motion and authorize use of cash collateral to avoid immediate and irreparable harm to the Debtors' estates.  See Fed. R. Bankr. P. 4001(b)(2) and (c)(2).

56.     The Debtors request that the Court (a) conduct an expedited hearing with respect to this Motion and (b) schedule the final hearing on the use of cash collateral at the earliest possible date convenient for the Court in accordance with Bankruptcy Rule 4001(b) and (c).

### Notice

57.     No trustee, examiner or official committee has been appointed in these chapter 11 cases.  Notice of this Motion has been served on the following parties or, in lieu thereof, to their counsel, if known: (i) the United States Trustee for the Western District of Pennsylvania; (ii) those creditors listed on the Debtors' List of Creditors Holding 20 Largest Unsecured Claims; (iii) the Debtors' prepetition secured lender; (iv) the proposed debtor in possession financing lender; (v) the District Director of Internal Revenue; (vi) the Texas Commission on Environmental Quality; and (vii) the Texas Office of the Attorney General Environmental Protection Division.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice need be given.

### No Prior Request

58.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request entry of interim and final orders granting the relief requested herein.

Dated:  June 14, 2016                Respectfully submitted,

Sean D. Malloy (Ohio 0073157) (*pro hac vice* pending)
Michael J. Kaczka (Ohio 0076548) (*pro hac vice* pending)
Joshua A. Gadharf (Michigan P76860) (*pro hac vice* pending)
McDONALD HOPKINS LLC
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114
Telephone:  (216) 348-5400
Facsimile:   (216) 348-5474
E-mail:  smalloy@mcdonaldhopkins.com
         mkaczka@mcdonaldhopkins.com
         jgadharf@mcdonaldhopkins.com

-and-

*/s/ William E. Kelleher, Jr.*
William E. Kelleher, Jr. (Pa. I.D. No. 30747)
Thomas D. Maxson (Pa. I.D. No. 63207)
Helen S. Ward (Pa. I.D. No. 204088)
COHEN & GRIGSBY, P.C.
625 Liberty Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 297-4900
Facsimile:  (412) 209-0672
Email: wkelleher@cohenlaw.com
        tmaxson@cohenlaw.com
        hward@cohenlaw.com

PROPOSED COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION